THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE W. BISSETT, Plaintiff in Error.

*Opinion filed October 28, 1910.*

1. MURDER—*there must be malice, express or implied, to constitute murder.* It is indispensable to a conviction for murder that the killing be done with malice aforethought, express or implied, otherwise the offense, under the statute, is manslaughter.

2. SAME—*when proof must show the defendant knew deceased was a policeman.* Where the man killed by the defendant in an unprovoked assault by the deceased was unknown to the defendant and wore no uniform or badge and gave no intimation that he was a police officer in plain clothes, it must be proven beyond a reasonable doubt that the defendant knew that the deceased was a policeman before the People can rely upon the official character of the deceased as characterizing the killing as murder.

3. SAME—*when conviction for murder cannot stand.* A conviction for murder on the theory that the killing was done while the defendant was resisting arrest by the deceased cannot stand where the evidence shows that the deceased was unknown to the defendant, that he was in plain clothes and wore no badge and was not

looking for the defendant for any reason, but that he suddenly seized the defendant, after inviting him to drink, and demanded what the defendant had in his pocket, and in the ensuing scuffle was shot by the defendant and killed.

4. SAME—*when giving abstract instruction is error.* In a murder trial, where the defendant relies upon self-defense, it is error to give an abstract instruction for the People which is susceptible of being construed as assuming that the killing was not in self-defense. (*People* v. *Jacobs,* 243 Ill. 580, followed.)

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. KICKHAM SCANLAN, Judge, presiding.

DARROW, MASTERS & WILSON, for plaintiff in error.

W. H. STEAD, Attorney General, and JOHN E. W. WAYMAN, State's Attorney, (JUNE C. SMITH, and EDWARD S. DAY, of counsel,) for the People.

Mr. JUSTICE COOKE delivered the opinion of the court:

Plaintiff in error was convicted in the criminal court of Cook county of the crime of murder and sentenced to the penitentiary for life. He has sued out a writ of error to review the record and judgment of the criminal court, and assigns various errors.

It is first contended that if any crime was committed it was not that of murder, but of manslaughter.

The facts bearing upon the character of the crime, as proven by the State, are, that plaintiff in error, George Bissett, was in the saloon of Barney Bertsche, at the corner of Randolph street and Fifth avenue, in the city of Chicago, at about 10:30 o'clock P. M., on June 12, 1909. He was standing at one end of the bar engaged in conversation with a man referred to by the witnesses as Fatty Eck, when William Russell, the deceased, and Thomas J. Stapleton, two members of the police force of the city of Chicago, entered the saloon. Russell and Stapleton had been detailed earlier

in the evening to attend a meeting of the Sheet Metal Workers' Union as plain clothes men, at Franklin and Washington streets. An election of officers was being held at this meeting, and having been completed at 7:30 o'clock P. M., the room was cleared and the members of the union congregated at a saloon in that vicinity. Russell and Stapleton mingled with them until about half-past ten o'clock, when they left and repaired to the saloon of Barney Bertsche. Their purpose in going there does not clearly appear, but there is nothing in the evidence to indicate that they were seeking or expecting to find the plaintiff in error. When they entered Bertsche's saloon they were each of them dressed in citizen's clothes and wore no badge or insignia of their office whatever, and nothing was said or done by anyone, from the time they entered the saloon until Russell was killed, to indicate that either Russell or Stapleton was a member of the police force. Eck did not testify, and whether he remained in the saloon and witnessed the shooting does not appear. The only witnesses who testified to the shooting on behalf of the State were Stapleton, Joe Jones, the bar-tender on duty at the time of the shooting, Thomas F. Walsh, a bar-tender who was off duty at the time, and Thomas Kavanaugh, who was the manager of Bertsche's saloon. Thomas Corcoran, who was employed as bar-tender for Barney Bertsche on June 12, 1909, but had gone off duty at seven o'clock in the evening, was called and examined by the court. From the testimony of these witnesses it appears that immediately after Russell and Stapleton had entered the saloon, each having ordered and drank a glass of beer, Russell approached Bissett, the plaintiff in error, spoke to him and shook hands with him. Bissett replied, "I don't know you, and you don't know me from Adam," and upon receiving the reply, "Well, maybe I don't," invited Russell to have a drink with him. After drinking Russell went to the closet, and upon his return Bissett stated that he was going home and bade Russell

good-night. Russell remarked, "What's your hurry? Have another drink." At the time this remark was made Russell had secured the place at the end of the bar formerly occupied by Bissett. Bissett informed him that he was in his place at the bar, and Russell having made some remark about securing it first, Bissett said that he would not drink unless he had his own place at the bar. Russell started to walk around Bissett to give him his desired place at the bar, and the next thing that any of the witnesses were able to describe as having occurred was that Russell had seized Bissett over one of his pockets, and the two of them circled and scuffled across the room. It is not pretended by any of the witnesses that they heard all that was said between them, but it is clear that Russell said to Bissett: "I want what you have in your pocket; you know what I mean; I eat those things." At the time these words were uttered Russell had seized Bissett with both hands and the two were struggling. Instantly several shots were fired in quick succession. The men separated, but whether at the instant of the commencement of the firing or immediately before does not clearly appear. Russell staggered a pace or two and fell beside a table in a booth a short distance from the end of the bar. Stapleton then opened fire upon Bissett, and the evidence is that Bissett continued to fire at both the body of Russell lying in the booth and at Stapleton. According to the testimony of the witnesses but very few seconds elapsed from the time Russell started to go around Bissett at the end of the bar and the struggle began until the affray was over, and it is apparent that the action was so rapid that none of the witnesses could tell all that occurred or detail accurately the correct sequence of the events. Russell received five bullet wounds,—three of them in the head, the other two being in the left arm. After the shooting a police officer, who came in from police headquarters at the city hall next door, found Russell's revolver in its holster lying upon the table beside which he had

fallen, fully loaded and with no shells exploded. Bissett was shot in the abdomen and in the arm. Stapleton also received a gunshot scalp wound.

The People proved that Russell was a police officer, and were permitted to offer in evidence ordinances of the city of Chicago defining the rights and duties of a police officer, and declaring it to be a crime to carry concealed weapons within the limits of the city. The case was evidently tried on the part of the People upon the theory that Bissett did the shooting while resisting arrest, and it is apparent the jury must have adopted that theory. There is no legitimate evidence in the record which fairly tends to prove either that Bissett knew Russell was a police officer at the time of the shooting or that Russell was attempting to place Bissett under arrest. No statement of Russell was testified to by any of the witnesses that would indicate that he had either notified Bissett of his official character or was attempting to place him under arrest. He had no warrant for the arrest of Bissett, was not looking for him, had not expected to meet him, and the only theory upon which it could be assumed that he was attempting to arrest him would be that he had detected him in the act of carrying a concealed weapon. The only evidence in the record from which it could be argued that Bissett had any knowledge of the official character of Russell was the concession made on the trial that nine years before that time Russell, as a police officer of the city of Chicago, had placed Bissett under arrest and had him under his control for a period of about two hours. There is nothing to show under what circumstances this arrest was made; whether Bissett was in a condition to remember who had arrested him; whether he knew the name of the officer; whether at that time Russell was in a police uniform, or whether during the nine years that had elapsed since the time of that arrest Russell's personal appearance had been changed in any material way. Bissett on the stand denied that he recognized Rus-

sell or knew who he was. The testimony of all the witnesses for the People who testified on that point is to the effect that when Russell spoke to Bissett he was immediately informed by him that he·did not know him. Russell made no attempt to explain who he was, except to state, "My name is Russell," and made no attempt whatever, then or afterward, to make known the fact that he was a police officer. Under this state of facts his official character has no bearing whatever upon the case, and the character of the crime, if any was committed, must be determined just as though this affray had occurred between two private citizens. The evidence does not disclose that plaintiff in error entertained any feeling of malice or hatred for the deceased or that he sought any quarrel with him. On the contrary, when deceased spoke to him he answered pleasantly, invited him to drink with him, and later informed him that he was going home and bade him good-night, and it was only upon the insistence of the deceased that he remained. That the plaintiff in error did not assail deceased in the first instance is uncontroverted. The testimony of the People's witnesses is that the deceased first seized hold of Bissett and for a few moments handled him roughly, scuffling with him across the room and demanding that he deliver to him that which he had in his pocket, giving as his only reason for the demand that he ate those things. There was no pause in the struggle or conflict, even momentary, from the time Russell first seized hold of Bissett until after the shots were fired and Russell fell dead in the booth.

It must be apparent that under this state of facts a conviction for murder cannot stand. It is indispensable, before one can be convicted of the crime of murder, that the act be done with malice aforethought, either express or implied. Here the element of malice, under the case as made by the People, was wholly wanting. Under our statute the crime committed could not have been more than manslaughter, which, to use the language of the statute, "is the un-

lawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever. It must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible.   *   *   *   In cases of voluntary manslaughter, there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing.  The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should appear to have been an interval between the assault or provocation given, and the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and punished as murder." That Russell was inflicting upon plaintiff in error a highly provoking injury at the time he voluntarily seized him and demanded he turn over to him the contents of his pocket is clearly shown by the testimony of every witness to the assault. That from the time the affray began until Russell was shot and killed there was not the slightest pause in the activities of the two men engaged, and not the slightest opportunity offered plaintiff in error to deliberate or reason in regard to the matter, is clearly shown.  Under this state of facts the plaintiff in error, if guilty at all, is guilty of no graver offense than that of manslaughter, and upon motion for a new trial the verdict of the jury should have been set aside.

It is assigned as error that the court admitted improper evidence over the objection of plaintiff in error.  The State offered in evidence certain sections of the revised municipal code of Chicago in reference to carrying concealed weapons and the duties of police officers. These sections were, in substance, that it was unlawful for any person except sheriffs, coroners, constables, members of the police force and other peace officers engaged in the discharge of their official

duties to carry or wear under their clothes or concealed about their person any dangerous or deadly weapon, and that the several members of the police force, when on duty, should devote their time and attention to the discharge of their duties according to the laws and ordinances of the city, and should have power to arrest all persons in the city found in the act of violating ordinances and aiding or abetting in violations, and should arrest any person found under circumstances which would warrant a reasonable man in believing that such person had committed, or is about to commit, a crime. That neither the deceased nor Stapleton was clothed as a police officer or had any badge or insignia of his official character whatever displayed upon or about him at the time of the killing, and the further fact that plaintiff in error stated that he did not know who Russell was, and that Russell made no attempt whatever to disclose to him his official character or to state his intention of placing him under arrest, is undisputed and is shown by the State's own witnesses. The introduction of these ordinances was highly improper and constitutes reversible error. The State had no right, under the circumstances here, to rely for any purpose upon the official character of Russell. Before the State could take advantage of his official character for the purpose of characterizing the act of plaintiff in error as murder, it was essential that it be shown, beyond all reasonable doubt, that the plaintiff in error had knowledge of Russell's official character and of his authority. *Rafferty* v. *People,* 69 Ill. 111; *Starr* v. *United States,* 153 U. S. 614.

Plaintiff in error, on the trial, relied upon self-defense as a defense to the indictment. He testified that Russell had seized him by the hand, upon which he wore a diamond ring, and that he thought he was trying to take the ring from his finger. He describes the struggle almost as it was described by the other witnesses, except that he states that after Russell had seized him Russell asked plaintiff in er-

ror if he had a gun; that he told him he had, and there-
upon drew a gun from his pocket with the intention, as he
says, of frightening Russell, as he believed he was about to
be robbed.    Plaintiff in error had two guns upon his per-
son, and while he held one of them aloft, according to his
testimony, Russell retained his hold on the other, which re-
mained in Bissett's pocket.    Plaintiff in error testifies that
immediately after he had displayed his gun Russell drew
his own revolver and shot plaintiff in error in the abdo-
men, whereupon he fired the shots into Russell's head which
killed him.

Plaintiff in error complains of a number of instructions
given upon the subject of self-defense.    In the giving of
most of those complained of we find no error, as they un-
doubtedly stated the law correctly.    A number of instruc-
tions were given on the part of the People containing mere
abstract propositions of law, which, in the light of the de-
fense made by plaintiff in error, may have been miscon-
strued by the jury and were calculated to be misleading.
One of these was the same instruction criticised by us in
*People* v. *Jacobs,* 243 Ill. 580, and is subject to the same
criticism here.    The instruction is, in part, as follows:
"The court instructs the jury further, as a matter of law,
that the law presumes that a person intends all the natural,
probable and usual consequences of his acts; that when one
person violently assails another, not in self-defense and not
in a sudden heat of passion which is caused by a provoca-
tion apparently sufficient to make the passion irresistible or
involuntary,    *    *    *    and the life of the party thus as-
sailed is actually destroyed in consequence, then the legal
and natural presumption is that death or great bodily harm
was intended, in which case the law implies malice, and
such killing would be murder."    As was stated in the *Ja-
cobs case,* it was error to give this instruction, in view of
the defense made, for the reason that it is susceptible of
being construed as assuming that the deceased was killed

not in self-defense. It also assumes that the facts were such that the acts constituted the crime of murder and not that of manslaughter.

Complaint is made of the refusal to give a number of the instructions asked on the part of the plaintiff in error. Some of these instructions were proper, and no doubt would have been given by the court had they not been covered by other instructions given. Plaintiff in error's modified instruction 9, complained of, is contradictory and meaningless and should not have been given as modified.

Plaintiff in error testified in his own behalf. On his cross-examination the State's attorney improperly went into his past life in considerable detail, and elicited the fact that he had been a gambler in the city of Minneapolis, in the city of Chicago and in the harvest fields of North Dakota for a period of time covering several years, and that during that time he had traveled under numerous aliases. While this was no doubt prejudicial to plaintiff in error and was carried on to the extent that the court finally interfered and required the State's attorney to desist, no objection was made or exception preserved on the part of plaintiff in error, and consequently there is nothing presented to us for review on that question. While counsel for plaintiff in error here, who did not participate in the trial below, concede that in the absence of exception this court has nothing to pass upon, they contend that this should be considered in connection with certain of the errors assigned. In view of the fact that the judgment must be reversed for the errors indicated, it is unnecessary for us to discuss that matter.

The judgment of the criminal court is reversed and the cause remanded to that court for a new trial.

*Reversed and remanded.*